Exhibit 1

| 2120 – Served | 2121 – Served |
| 2220 – Not Served | 2221 – Not Served |
| 2320 – Served By Mail | 2321 – Served By Mail |
| 2420 – Served By Publication | 2421 – Served By Publication |
| SUMMONS | ALIAS – SUMMONS |

(Rev. 12/3/01) CCG 0001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

METRO PREMIUM WINES, INC.,

        Plaintiff,

v.

BOGLE VINEYARDS, INC. and
WINEBOW, INC.,

        Defendant.

No. _____

**2011CH00498
CALENDAR/ROOM 07
TIME 00:00
Pet Reformation**

**PLEASE SERVE:**
Bogle Vineyards, Inc.
c/o Registered Agent:
Marc Battaglia
Perry, Bunch, Battaglia & Johnson
350 Court Street
Woodland, CA 95695

### SUMMONS

To each defendant:

    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the office of the Clerk of this Court at the following location:

☒  Richard J. Daley Center, 50 W. Washington, Room    802    Chicago, Illinois 60602

☐  **District 2 – Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

☐  **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

☐  **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

☐  **District 5 – Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

☐  **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

You must file within 30 days after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

    This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date. JAN 0 5 2011

| | |
|---|---|
| Atty. No. | 38234 |
| Name: | Mark H. Horwtich |
| Firm: | Tabet DiVito & Rothstein LLC |
| Attorney for: | Plaintiff |
| Address: | 209 S. LaSalle Street, 7th Floor |
| City/Zip: | Chicago, IL 60604 |
| Telephone: | (312) 762-9450 |

WITNESS,

_____

Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at:

_____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| 2120 – Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 – Not Served |
| 2320 - Served by Mail | 2321 – Served By Mail |
| 2420 – Served By Publication | 2421 – Served by Publication |
| SUMMONS | ALIAS – SUMMONS |

(Rev. 12/3/01) CCG 0001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

METRO PREMIUM WINES, INC.,

        Plaintiff,

v.

BOGLE VINEYARDS, INC. and
WINEBOW, INC.,

        Defendant.

No. ____

2011CH00498
CALENDAR/ROOM 07
TIME 00:00
Pet Reformation

**PLEASE SERVE:**
Bogle Vineyards, Inc.
c/o Registered Agent:
Marc Battaglia
Perry, Bunch, Battaglia & Johnson
350 Court Street
Woodland, CA 95695

### SUMMONS

**To each defendant:**

    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the office of the Clerk of this Court at the following location:

☒  Richard J. Daley Center, 50 W. Washington, Room     802     Chicago, Illinois 60602

☐  **District 2 – Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

☐  **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

☐  **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

☐  **District 5 – Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

☐  **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

You must file within 30 days after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

**To the officer:**

    This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

JAN 0 5 2011

| | | |
|---|---|---|
| Atty. No. | 38234 | |
| Name: | Mark H. Horwitch | |
| Firm: | Tabet DiVito & Rothstein LLC | |
| Attorney for: | Plaintiff | |
| Address: | 209 S. LaSalle Street, 7th Floor | |
| City/Zip: | Chicago, IL 60604 | |
| Telephone: | (312) 762-9450 | |

WITNESS, ____

____
Clerk of Court

Date of Service: ____
(To be inserted by officer on copy left with
defendant or other person)

Service by Facsimile Transmission will be accepted at: ____

____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

METRO PREMIUM WINES, INC.,            )
                                      )
     Plaintiff,                  )
                                      )
     v.                          )   Case No.
                                      )
BOGLE VINEYARDS, INC. and             )   JURY TRIAL DEMANDED
WINEBOW, INC.,                        )
                                      )
     Defendants.                 )

2011CH00498
CALENDAR/ROOM 07
TIME 00:00
Pet Reformation

## COMPLAINT

Plaintiff, Metro Premium Wines, Inc. ("Metro"), by its attorneys, Tabet DiVito &

Rothstein LLC, complains of defendants, Bogle Vineyards, Inc. ("Bogle") and Winebow, Inc.

("Winebow") (Bogle and Winebow are sometimes collectively referred to as "Defendants"), as

follows:

### NATURE OF THE ACTION

1.    This case is about Bogle and Winebow's unlawful actions to have Winebow

displace Metro as the exclusive northern Illinois distributor of Bogle's wine and to have

Winebow take over Metro's customer relationships and to expropriate Metro's sales and profits,

all without proper notice to Metro.

2.    In or about 1990, Metro entered into an oral contract with Bogle to become the

exclusive distributor of Bogle wine in Illinois north of Interstate I-80 (the "Territory"). Oral

agreements to distribute a vineyard's wine are the normal and customary arrangement in the

industry. At the time Metro took over the distribution and sales of Bogle wine in the Territory,

distribution was less than 50 cases of Bogle wine per year. Metro told Bogle that it would make

its wine a priority and it did. Under Metro, the sales of Bogle wine in the Territory increased

exponentially, growing to approximately 25,000 cases per year. As a result of Metro's promotion of Bogle wine, the label accounted for almost 59% of Metro's business, a fact known to Bogle.

3.   Nonetheless, Sam Bon ("Bon"), Bogle's national sales manager, resolved to replace Metro as Bogle's distributor with Winebow. Winebow – with whom Bon had a longstanding relationship and on information and belief and a reasonable opportunity for discovery will show a secret and improper arrangement – desperately wanted to distribute Bogle and other wines in Illinois, and, in particular, the lucrative Chicagoland market. Accordingly, beginning in the fall of 2009, Bogle and Winebow engaged in an overarching scheme to misappropriate Metro's business and customers.

4.   As more fully alleged below, in October and November 2009, Bogle and Winebow misled Metro into providing Winebow with valuable confidential and proprietary information regarding Metro's internal financials, customer accounts and employee compensation. Then, Winebow accomplished its objective to become the Bogle distributor in the Territory by purposefully causing Bogle to terminate its distributorship agreement with Metro. On September 30, 2010, Bogle, without warning, sent a letter informing Metro that the parties' distributorship agreement was terminated. The sudden termination of Metro's Bogle distributorship has devastated the company's business.

5.   Winebow, in furtherance of Defendants' scheme, has now replaced Metro as Bogle's exclusive distributor in the Territory, and on information and belief and a reasonable opportunity for discovery will show that Winebow is using Metro's confidential and proprietary information to sell Bogle and other wines and to compete against Metro in the Chicagoland market.

6.     As described in detail below, Defendants' wrongful conduct gives rise to claims of breach of contract, breach of the implied duty of good faith and fair dealing, tortious interference with prospective economic relations, aiding and abetting fraud and civil conspiracy against Bogle, and claims of equitable reformation, breach of confidentiality agreement, tortious interference with prospective economic relations, fraud, civil conspiracy and unjust enrichment against Winebow. By this action, Metro seeks compensatory and punitive damages against Defendants.

## PARTIES

7.     Metro is a privately owned Illinois corporation with its principal place of business in Elk Grove Village, Illinois. Since 1988, Metro has been in the business of distributing wines and spirits to retail customers throughout Illinois, focusing on the greater Chicagoland market.

8.     Bogle is a privately owned California corporation with its principal place of business in Clarksburg, California. Bogle is in the business of producing wine which it sells through distributors.

9.     Winebow is a privately owned Delaware corporation with its principal place of business in Montvale, New Jersey. Like Metro, Winebow is in the business of distributing wines and spirits to retail customers.

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Bogle because, at all times relevant to this action, Bogle was doing business in Illinois in that it: (a) had an Illinois Winery Shipper's License issued by the Illinois Liquor Control Commission, (b) regularly shipped wine to, and had its wine sold in, Illinois, (c) maintained a sales office in Illinois, (d) had Illinois-based employees, and (e) had its employees travel to Illinois to make and solicit sales and to oversee

3

operations. Moreover, at all times relevant to this action, Bogle maintained contacts with Illinois by: (a) transacting business with, (b) committing certain fraudulent and other tortious acts against, and (c) entering into a contract with, Metro in Illinois.

11. This Court has personal jurisdiction over Winebow because Winebow: (a) is registered to do business in Illinois, (b) has a registered agent in Illinois, (c) has a distributor license that authorizes it to purchase, store, possess or warehouse alcoholic beverages in Illinois for resale, (d) maintains a warehouse facility in Illinois, and (e) has Illinois-based employees. Moreover, at all times relevant to this action, Winebow maintained contacts with Illinois, by: (a) transacting business with, (b) committing certain fraudulent and other tortious acts against, and (c) entering into a contract with, Metro in Illinois.

12. Venue is proper in Cook County, pursuant to 735 ILCS 5/2-101, because Defendants are doing business in Cook County, Defendants are not residents of Illinois, and because the transactions out of which Metro's causes of action arose occurred in Cook County, Illinois.

## FACTUAL BACKGROUND

### *Metro's Business*

13. Metro was founded in 1988 by Larry Palmerson ("Palmerson"), who currently is the company's president and owner. Metro is licensed in Illinois to import and to distribute wines and spirits to retailers including restaurants, hotels, clubs and wine shops. It currently employs ten individuals, and it maintains office and warehouse facilities in Elk Grove Village, Illinois.

*Metro Begins Distributing Bogle Wine*

14.     In or about 1990, Metro and Bogle entered into an oral distributorship agreement (the "Distributorship Agreement") whereby Bogle granted to Metro the exclusive right to distribute wines produced by Bogle in the Territory. Before entering into the Distributorship Agreement with Metro, Bogle had virtually no sales in the Territory.

15.     Pursuant to the Distributorship Agreement, Metro agreed to use its best efforts to sell Bogle wine in the Territory, to warehouse the wine in sufficient quantities to meet the needs of its customers and to promote Bogle wine by way of quality of service to its customers. In return, Bogle agreed to provide its wine to Metro at prices and with discounts consistent with the prices and discounts it provided to its other distributors, and Bogle agreed to extend credit to Metro such that payment for wine ordered by Metro would be due within 60 days after the products were invoiced by Bogle. Through a course of dealing and performance over the term of the distributorship, Bogle routinely accepted payments from Metro within 70 days of invoicing.

16.     The Distributorship Agreement did not have a termination provision, and under applicable law, it could be terminated only upon reasonable notice.

17.     In furtherance of its position as Bogle's exclusive distributor in the Territory, Metro expended a great deal of time and invested substantial amounts of money in developing a retail network for Bogle wine. Through Metro's efforts, sales in the Territory of Bogle wine dramatically increased. Sales in the Territory grew from approximately 1,000 cases of wine in the first year of the Distributorship Agreement to 25,000 cases in 2009. Metro's Bogle customers included Costco, Dominick's, Whole Foods, Meijer, Fresh Market, Sunset Foods, Treasure Island, Woodman's Food Market, Binny's Beverage Depot and Catering by Michael's, among others.

18.     Further, as a result of Metro's efforts, the importance of Bogle wine to Metro's business also increased such that in 2009, Bogle sales accounted for 59% of Metro's total wine sales and the overwhelming majority of Metro's profits.  In fact, without the Bogle business, Metro would not be a profitable business.  In his conversations with Bogle's representatives throughout the parties' relationship, Metro's Palmerson made it known to them that Bogle wine accounted for the majority of Metro's sales and profits.

### Bogle and Winebow Conspire to Have Winebow Take Over Metro's Business.

19.     Despite the tremendous success in the Territory that Bogle enjoyed through Metro's efforts, Bogle's Bon was resolved to replace Metro as Bogle's distributor with Winebow.  For a number of years, Winebow has been Bogle's distributor in New York and in New Jersey, and on information and belief and a reasonable opportunity for discovery will show that Bon had a secret and improper arrangement with Winebow.

20.     For its part, Winebow, through its close relationship with Bon, knew of Bogle's Distributorship Agreement with Metro, and Winebow had long desperately wanted to distribute Bogle and other wine brands in Illinois, and, in particular, the lucrative Chicagoland market.  However, Winebow, unlike Metro, did not possess the knowledge, the customer relationships, the employees with the local connections and experience, or the market data to build a successful wine distribution business in the Chicagoland area from scratch.  Accordingly, on information and belief and a reasonable opportunity for discovery will show that Defendants hatched a scheme to have Winebow displace Metro as Bogle's distributor in the Territory and to then directly compete against Metro using Metro's confidential and proprietary information that Defendants fraudulently obtained.  As set forth below, Defendants committed a number of unlawful acts in furtherance of this scheme.

### Defendants Fraudulently Induce Metro to Provide Winebow
### with Proprietary and Confidential Information.

21.    Pursuant to the scheme devised by Defendants, on or about October 19, 2009, ostensibly in an effort to buy into the Chicagoland wine distributorship business, Winebow's Senior Director of Corporate Development, Kevin Groff ("Groff"), approached Metro's Palmerson and expressed an interest in acquiring Metro.

22.    In furtherance of this expressed interest, Groff requested that Winebow be permitted to conduct extensive "due diligence" on Metro to enable Winebow to formulate a bonafide offer to buy Metro from Palmerson. In order to induce Metro to provide its confidential and proprietary information to Winebow, Groff represented to Palmerson that Winebow would keep this sensitive information confidential and use it only for the purpose of preparing an offer.

23.    Bogle was fully aware of the discussions between Metro and Winebow, and in fact, Bogle used its leverage over Metro to induce Metro to cooperate with Winebow's request for Metro's confidential and proprietary information. Specifically, Bogle's Bon made several unsolicited phone calls to Palmerson in late October 2009 and told Palmerson that Winebow had the financial resources to further increase Metro's sales in the Territory and that Bogle would look very favorably upon a sale of Metro to Winebow. In reality, Bon knew that Winebow had no interest in acquiring Metro for a fair price; rather, it was Winebow's intention to obtain and use Metro's confidential and proprietary information to compete against Metro in furtherance of Defendants' scheme.

24.    Having elected to speak to Metro regarding a potential transaction, and having elected to represent to Metro that Winebow would keep the information confidential and use it only for the purpose of preparing an offer, Defendants had a duty to correct any misapprehension on Metro's part regarding the true purpose behind Winebow's acquisition overtures and

Winebow's request for Metro's confidential and proprietary information. Nevertheless, Defendants actively concealed from Metro that Winebow had no intention whatsoever of acquiring Metro for a fair price and that it was always Winebow's true intention to use Metro's own proprietary and confidential information to establish a competing wine distributorship.

25. Defendants' false representations and material omissions had their intended effect. Metro was lured into believing that Winebow's acquisition overtures were legitimate, and, therefore, Metro agreed to provide Winebow with its confidential and proprietary data. However, because Winebow was a potential direct competitor, Metro was unwilling to provide Winebow with its confidential and proprietary information unless Winebow entered into a confidentiality agreement related to the disclosure of this sensitive information prior to providing Winebow with such information as part of the due diligence process. On November 9, 2009, Metro and Winebow entered in such a confidentiality agreement (the "Confidentiality Agreement"). A copy of the Confidentiality Agreement is attached as Exhibit A.

### The Terms of the Confidentiality Agreement

26. Under the express terms of the Confidentiality Agreement, Winebow was bound to retain in confidence all confidential or proprietary information ("Confidential Information") provided by Metro to it and to any of its representatives during the "due diligence" conducted in contemplation of the potential acquisition. *See* Exhibit A at ¶¶1, 3.[1]

27. Winebow further agreed to use the Confidential Information only in connection with its consideration of whether to purchase Metro and not to use the Confidential Information in its business or to disclose it to any other party. *See* Exhibit A at ¶3.

---

[1] The Confidentiality Agreement contains an obvious drafting error that Winebow has acknowledged. It states that the party disclosing the Confidential Information is Winebow and the "Recipient" of the Confidential Information is Metro. However, as discussed above, it was the intent of both parties for the Confidentiality Agreement to apply to the Confidential Information that Metro provided to Winebow. In fact, Winebow did not disclose any Confidential Information to Metro.

28.    Winebow further agreed that, in the event the acquisition did not occur, it would destroy all Confidential Information provided to it during the course of the due diligence, including all copies thereof. *See* <u>Exhibit A</u> at ¶2.

29.    Under the Confidentiality Agreement, Winebow also agreed that, for an eighteen-month period from the date of the Confidentiality Agreement, Winebow would not solicit the employment of any Metro employee or induce any Metro employee to terminate his or her employment with Metro. *See* <u>Exhibit A</u> at ¶8.

30.    Additionally, the Confidentiality Agreement provided that in the event litigation arose between Metro and Winebow related to the Confidentiality Agreement, the prevailing party would be entitled to recover its reasonable attorneys fees and costs. *See* <u>Exhibit A</u> at ¶7.

*Winebow Gains Access to Metro's Confidential Information.*

31.    After the execution of the Confidentiality Agreement, on or about November 9, 2009, Metro sent Winebow its Confidential Information, including: Metro's sales by brand and product (including the various Bogle labels), detailed Metro customer account information, information regarding Metro's pricing and margins, Metro's internal financials (which reflected the critical importance of Bogle wine to Metro's finances), and detailed information regarding Metro's employees' sales performance and compensation structure. Such information was not available to the public, was safeguarded by Metro and would be of great benefit to anyone seeking to enter the Illinois market as a competitor of Metro.

32.    Thus, if this sensitive information were improperly used by Winebow, it could have a successful wine distributorship in Illinois without actually having to acquire Metro. Unbeknownst to Metro, that is precisely what Winebow was attempting to do. At the very same time that it was still purportedly engaged in the "due diligence" process, and while it was

promising Metro that a legitimate acquisition offer would be forthcoming, Winebow was clandestinely carrying out the scheme that it had developed with Bogle to take over Metro's relationships with its customers using Metro's Confidential Information.

*Winebow Establishes a Competing Distributorship.*

33.     On November 12, 2009, just three days after the Confidentiality Agreement was signed, Winebow registered itself with the Illinois Secretary of State as a foreign corporation qualified to conduct business in Illinois. On approximately the same date, Winebow filed with the Illinois Liquor Commission an application for a license to distribute alcoholic beverages in Illinois for resale to Illinois alcoholic beverage retailers. Further, on information and belief and a reasonable opportunity for discovery will show that Winebow was negotiating in the fall of 2009 to lease a 37,000 square foot warehouse at 3350 North Kedzie Avenue in Chicago from which to distribute wine in Illinois.

34.     On February 11, 2010, the Illinois Liquor Commission granted Winebow's application for its distributor license and, shortly thereafter, Winebow commenced distribution operations out of its 37,000 square foot warehouse space at 3350 North Kedzie Avenue.

35.     In April 2010, once Winebow had bled Metro dry of its confidential and proprietary information, and after it commenced its Illinois wine distribution operations, Winebow effectively severed its discussions for the acquisition of Metro by making an offer that was so absurdly low that it was clearly intended to force a rejection from Metro, which it did.

*In Furtherance of the Conspiracy, Winebow Uses Metro's
Confidential Information to Substantially Damage Metro's Business.*

36.     On information and belief and a reasonable opportunity for discovery will show that notwithstanding the contractual obligations contained in the Confidentiality Agreement, Winebow has implemented its plan to utilize the Confidential information that it received during

the due diligence process to support its wine distribution operations in Illinois. That is, Winebow is currently using the Confidential Information to sell various brands of wines to Metro's customers, including but not limited to Dominick's, Whole Foods, Meijer, Fresh Market, Sunset Foods, Treasure Island, Woodman's Food Market and Binny's Beverage Depot, resulting in lost sales and profits to Metro.

37. Moreover, despite the existence of the no-raid clause in the Confidentiality Agreement, on or about November 5, 2010, Winebow induced Robert Ruiz ("Ruiz") to resign from Metro and work for Winebow performing the same duties that he performed while at Metro.

### *Winebow Intentionally Induces Bogle to Terminate and Breach the Distributorship Agreement, Critically Damaging Metro's Business.*

38. Once Winebow's Illinois distributorship operations were fully up and running, it was time for Defendants to carry out the final step in their conspiracy and to replace Metro with Winebow. On September 30, 2010, Metro received a notice of termination of the Distributorship Agreement from counsel for Bogle (the "Notice of Termination"). A copy of the Notice of Termination is attached as Exhibit B.

39. In the Notice of Termination, Bogle raised a number of reasons for its decision to terminate the Distributorship Agreement, but those justifications were factually baseless and pre-textual. For example, the Notice of Termination referenced Metro's alleged failure to comply with payment-schedule terms that were not even part of the Distributorship Agreement.

40. The Notice of Termination stated that Bogle was terminating the Distributorship Agreement, effective December 31, 2010; however, in the Notice of Termination, Bogle unilaterally imposed conditions upon the brief continuation of the Distributorship Agreement

that were so drastically unfavorable and onerous to Metro that the Distributorship Agreement was, in fact, terminated effective September 30, 2010, if not before.

41.    Specifically, as set forth above, prior to September 2010, Metro had been the exclusive distributor of Bogle wines in the Territory and Metro had been afforded credit terms which allowed Metro to warehouse Bogle wines in quantities needed to fill its customers' orders. In the Notice of Termination, Bogle informed Metro that Winebow would become Metro's "dual distributor" in the Territory effective October 1, 2010, and that Bogle was immediately cutting off Metro's credit. Once Bogle installed Winebow as a co-distributor in Metro's Territory and cut off Metro's credit, Metro's Bogle distributorship effectively ended.

42.    Bogle's sudden and unexpected termination of the Distributorship Agreement has caused sustained and grievous harm to Metro because it has lost its number one brand, a brand which had grown to 25,000 cases per year due to Metro's efforts. Moreover, Bogle's abrupt termination of the Distributorship Agreement forced Metro to cut its staff and their salaries in an effort to remain viable.

43.    Despite its efforts, Metro has still not come close to replacing the sales of Bogle and commensurate revenues and profits lost as a result of Bogle's unexpected, sudden and unreasonable termination of the Distributorship Agreement.

44.    On information and belief, Winebow caused Bogle's unexpected, sudden and unreasonable termination of the Distributorship Agreement by, among other things, entering into a secret and improper arrangement with Bon and Bogle that incentivized Bogle to terminate its relationship with Metro and replace Metro with Winebow.

45.     On account of Defendants' repeated and willful acts of misconduct and their violations of their contractual obligations, Metro brings the following claims and seeks the following relief.

<h2 style="text-align:center">COUNT I<br>BREACH OF CONTRACT – THE DISTRIBUTORSHIP AGREEMENT<br>(Metro v. Bogle)</h2>

46.     Metro realleges paragraphs 1 through 45 though fully set forth herein.

47.     The Distributorship Agreement is a valid, binding and enforceable contract.

48.     Metro fully performed its obligations under the Distributorship Agreement.

49.     Under the Illinois Uniform Commercial Code, 810 ILCS 5/2-309(3), Bogle was required to provide reasonable notice of its termination of the Distributorship Agreement.

50.     Under the law, reasonable notice means sufficient time to allow Metro to seek a substitute product line for the Bogle wine and recoup its investment. The required length of a reasonable notice should be consistent with the extraordinary amount of time, effort and money that Metro devoted to increasing the volume of sales of the product manufactured by Bogle, the significance of the distributorship to Metro, and the prevailing conditions in the wine distribution industry in Illinois.

51.     Bogle's sudden termination of the Distributorship Agreement, together with its unilateral modification of the procedure for ordering and purchasing wine and its appointment of Winebow as Bogle's co-distributor, effectively ended Metro's distribution of Bogle without notice and gave it no time to find a reasonable substitute.

52.     As a result of Bogle's actions, Metro's sales and profits have been decimated and Metro has lost, and is in danger of losing more, employees due to fears of losing their jobs.

53.     Under the circumstances of this case, Metro was entitled to at least one year's notice of the termination of the Distributorship Agreement.

54.     Therefore, Bogle breached the Distributorship Agreement by reaping the fruits of Metro's sales efforts, but failing to give reasonable notice of its termination of the Distributorship Agreement.  In addition, Bogle breached the Distributorship Agreement by unilaterally altering its terms in the Notice of Termination, thereby hindering Metro's performance and rendering its further performance impossible.

55.     As a direct and proximate result of Bogle's breach of the Distributorship Agreement, Metro has been damaged in an amount well in excess of $1,000,000 by reason of its lost profits and the lost value of its business.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Bogle and:

A.     Award Metro all compensatory damages resulting from Bogle's breaches of the Distributorship Agreement,

B.     Award Metro statutory pre-judgment and post-judgment interest, and

C.     Award Metro such other relief as the Court deems just and proper.

**<u>COUNT II</u>**
**BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**(Metro v. Bogle)**

56.     Metro realleges paragraphs 1 through 55 as though fully set forth herein.

57.     Under the law, all parties to a contract have implied duties of good faith and fair dealing.

58.     Bogle has breached its implied duty of good faith and fair dealing under the Distributorship Agreement by (1) unreasonably terminating the Distributorship Agreement

without reasonable notice so that Metro could have been able to arrange for a substitute product line for the Bogle wine; and (2) unilaterally altering the Distributorship Agreement's material terms in the Notice of Termination.

59.     As a direct and proximate result of Bogle's breach of the Distributorship Agreement, Metro has been damaged in an amount well in excess of $1,000,000 by reason of its lost profits and the lost value of its business.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Bogle and:

A.     Award Metro all compensatory damages resulting from Bogle's breaches of its implied duties of good faith and fair dealing,

B.     Award Metro statutory pre-judgment and post-judgment interest, and

C.     Award Metro such other relief as the Court deems just and proper.

### COUNT III
### EQUITABLE REFORMATION OF THE
### CONFIDENTIALITY AGREEMENT BASED ON MUTUAL MISTAKE
### (Metro v. Winebow)

60.     Metro realleges paragraphs 1 through 45 as though fully set forth herein.

61.     In October 2009, Metro and Winebow reached a meeting of the minds with respect to the confidential and proprietary information that Metro agreed to provide Winebow as of part of the "due diligence" conducted in contemplation of Winebow's potential acquisition of Metro.

62.     Metro and Winebow agreed, among other things, that Winebow would retain in confidence all confidential and proprietary information conveyed by Metro to Winebow and to any of its representatives during the "due diligence."

63.    Metro and Winebow reduced their agreement to writing in the Confidentiality Agreement, which was entered into on November 9, 2009.

64.    In the Confidentiality Agreement, the term "Company" was supposed to refer to Metro and the term "Recipient" (of the documents) was supposed to refer Winebow. However, because of a mutual mistake of fact, the term "Company" in the Confidentiality Agreement erroneously referred to Winebow and the term "Recipient" erroneously referred to Metro. Thus, a variance exists between the parties' true agreement and the terms of the writing intended to embody the agreement.

65.    Metro is entitled to have the Confidentiality Agreement accurately reflect the intentions of the parties.

**WHEREFORE,** Metro respectfully requests that the Court enter judgment in its favor and reform the Confidentiality Agreement to reflect the parties' agreement that the term "Company" refers to Metro and that the term "Recipient" refers to Winebow.

## COUNT IV
## BREACH OF CONTRACT – THE CONFIDENTIALITY AGREEMENT
### (Metro v. Winebow)

66.    Metro realleges paragraphs 1 through 45 and 60 through 65 as though fully set forth herein.

67.    The Confidentiality Agreement is a valid, binding and enforceable contract.

68.    Metro fully performed its obligations under the Confidentiality Agreement by providing Winebow with the Confidential Information.

69.    As set forth more fully above, Winebow, on information and belief, breached the Confidentiality Agreement by utilizing the Confidential Information disclosed by Metro pursuant

to the Confidentiality Agreement to operate its Illinois wine distributorship and to unfairly compete with Metro.

70.    Winebow further violated the Confidentiality Agreement by inducing Ruiz to resign from Metro and to work for Winebow.

71.    As a direct and proximate result of Winebow's breaches of the Confidentiality Agreement, Winebow has suffered substantial monetary damages, including lost profits, the lost value of its business and the loss of its goodwill, and Metro's damages are continuing.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Winebow and:

A.    Award Metro all compensatory damages resulting from Winebow's breaches of the Confidentiality Agreement,

B.    Award Metro statutory pre-judgment and post-judgment interest,

C.    Enjoin Winebow's continuing breaches of the Confidentiality Agreement,

D.    Aware Metro its reasonable attorneys fees and costs pursuant to paragraph 7 of the Confidentiality Agreement, and

E.    Award Metro such other relief as the Court deems just and proper.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (Metro v. Winebow)

72.    Metro realleges paragraphs 1 through 55 as though fully set forth herein.

73.    Metro had a reasonable expectation that its distributor relationship with Bogle would continue, based on, among other things, the course of dealing between Metro and Bogle, the substantial success that Metro had increasing Bogle's sales in the Territory, and the

substantial amount of time, effort and money that Metro devoted to selling Bogle in the Territory.

74. As set forth in detail above, Winebow, through its relationship with Bogle and its access to Metro's Confidential Information, was well aware that Metro had an exclusive distributor relationship with Bogle and that Metro expected that relationship to continue.

75. Despite its awareness of Metro's business expectancies with Bogle, Winebow, on information and belief, intentionally and without privilege induced Bogle to terminate its exclusive distributor relationship with Metro by, among other things, entering into a secret and improper arrangement with Bon that incentivized him to terminate Bogle's relationship with Metro and replace Metro with Winebow.

76. Winebow, on information and belief, also tortiously interfered with Metro's relationships with its retail customers for Bogle wine. Since 1990, Metro has invested a great amount of effort, time and money to establish relationships with retail wine customers throughout Illinois for the sale of Bogle wine. Through these efforts, Metro has distributed hundreds of thousands of cases of Bogle wine to retail customers such Costco, Dominick's, Whole Foods, Meijer, Fresh Market, Sunset Foods, Treasure Island, Woodman's Food Market, and Binny's Beverage Depot, among others.

77. Metro had a reasonable expectation of entering into and/or continuing its business relationships with these retail customers for the sale of Bogle wine.

78. Through its close relationship with Bogle, as well as its receipt of the Confidential Information, Winebow was well aware of the manner in which Metro conducted its business, including the identity of Metro's customers. In addition, Winebow knew that, prior to Bogle's

termination of the Distributorship Agreement, Metro intended to and would have continued to make every effort to sell Bogle wine in the Territory in increasing amounts.

79.    Nevertheless, Winebow, on information and belief, intentionally and without privilege interfered with Metro's relationships with its Bogle customers by inducing Bogle to cut off its supply of wine to Metro and terminate its Bogle distributorship.

80.    As a direct and proximate result of Winebow's multiple acts of intentional interference with Metro's existing and prospective economic relations, Metro has sustained substantial monetary damages, including the, including lost profits, the lost value of its business and the loss of its goodwill.

81.    Winebow's tortious interference was marked by deception and bad faith, warranting the imposition of punitive damages.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Winebow and:

A.    Award Metro all compensatory damages resulting from Winebow's tortious interference with Metro's prospective economic relations,

B.    Award Metro statutory pre-judgment and post-judgment interest,

C.    Award Metro punitive damages because of the intentional nature of Winebow's conduct in an amount sufficient to deter further lawless conduct by Winebow and others, and

D.    Award Metro such other relief as the Court or jury deems just and proper.

**COUNT VI**
**COMMON LAW FRAUD**
**(Metro v. Winebow)**

82.    Metro realleges paragraphs 1 through 45 as though fully set forth herein.

83.     Beginning in approximately October 2009, Winebow, on information and belief, employed a fraudulent scheme that included repeated and knowingly false representations and omissions to induce Metro to provide Winebow with the Confidential Information.

84.     For the purpose of inducing reliance on the part of Metro to provide Winebow with the Confidential Information, Winebow made the material misrepresentations of fact and material omissions of fact described in above paragraphs 21, 22 and 24. In addition, Winebow made the knowing misrepresentations in the Confidentiality Agreement, described in above paragraphs 27 and 28, that it would use the Confidential Information only in connection with its consideration of whether to purchase Metro and not use the Confidential Information in its business or to disclose it to any other party.

85.     At the time that it made these material misrepresentations and omissions, Winebow, on information and belief, knew that it had no intention of acquiring Metro for a reasonable price and knew that it was going to use the Confidential Information for purposes other than in consideration of a decision whether to purchase Metro.

86.     Winebow was aware that Metro would rely on Winebow's misrepresentations and omissions of material facts in deciding whether to provide the Confidential Information to Winebow.

87.     As set forth above, Metro, in making its decision to provide the Confidential Information to Winebow, reasonably and justifiably relied upon Winebow's representations and omissions of material facts by providing Winebow with the Confidential Information. Metro would not have provided Winebow with the Confidential Information had it known that Winebow's representations were not true or if it were aware of the information concealed from it.

88.     As a direct and proximate result of Winebow's fraudulent conduct detailed above, Metro has sustained substantial monetary damages based, in part, on its loss of sales, the lost value of its business and the loss of its goodwill.

89.     Because of the intentional nature of Winebow's conduct, the imposition of punitive damages is warranted.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Winebow and:

A.      Award Metro all compensatory damages resulting from Winebow's fraud,

B.      Award Metro statutory pre-judgment and post-judgment interest,

C.      Award Metro punitive damages because of the intentional nature of Winebow's conduct in an amount sufficient to deter further lawless conduct by Winebow and others, and

D.      Award Metro such other relief as the Court deems just and proper.

## COUNT VII
## AIDING AND ABETTING FRAUD
### (Metro v. Bogle)

90.     Metro realleges paragraphs 1 through 45 and paragraphs 82 through 89 as though fully set forth herein.

91.     As set forth above, Winebow, on information and belief, engaged in a fraudulent scheme to obtain Metro's Confidential Information and to use that information for its competing wine distributorship.

92.     Bogle, on information and belief, possessed actual knowledge of Winebow's receipt and misuse of the Confidential Information and fraudulent conduct.

93.     On information and belief, Bogle knowingly aided and abetted, encouraged and actively participated in Winebow's fraud by, among other things, (1) making several unsolicited

phone calls to Metro's Palmerson to strongly encourage Metro to cooperate with Winebow's request for Metro's Confidential Information; (2) telling Palmerson that Winebow had the financial resources to further increase Metro's sales in the Territory and that Bogle would look very favorably upon a sale of Metro to Winebow when it knew that Winebow had no intention of acquiring Metro for a fair price; and (3) actively concealing from Metro that Winebow had no intention whatsoever of acquiring Metro and that it was always Winebow's true intention to illegally cripple Metro's wine distribution business and use Metro's own proprietary and confidential information to do so.

94.     As a result of Bogle's aid and abetment, inducement and active participation in Winebow's fraud, Metro has suffered substantial damages, based, in part, on its loss of sales, the lost value of its business and the loss of its goodwill, and Bogle is directly liable to Metro.

95.     Because of the intentional nature of Bogle's conduct, the imposition of punitive damages is warranted.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Bogle and:

A.     Award Metro all compensatory damages resulting from Bogle's aiding and abetting of Winebow's fraud,

B.     Award Metro statutory pre-judgment and post-judgment interest,

C.     Award Metro punitive damages because of the intentional nature of Bogle's conduct in an amount sufficient to deter further lawless conduct by Bogle and others, and

D.     Award Metro such other relief as the Court or jury deems just and proper.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (Metro v. Bogle and Winebow)

96.     Metro realleges paragraphs 1 through 45 and 82 through 95 as though fully set forth herein.

97.     Since it was established in 1988, Metro has invested a great amount of effort, time and money to establish relationships with retail wine customers throughout Illinois for the sale of several brands of wines besides Bogle ("Non-Bogle Wine"). Through its efforts, Metro has distributed hundreds of thousands of cases of Non-Bogle Wine to retail customers such Costco, Dominick's, Whole Foods, Meijer, Fresh Market, Sunset Foods, Treasure Island, Woodman's Food Market, and Binny's Beverage Depot, among others.

98.     Metro had a reasonable expectation of entering into and/or continuing its business relationships with these retail customers for the sale of Non-Bogle wine.

99.     As Bogle's exclusive distributor in the Territory until recently, Bogle was well aware of the manner in which Metro conducted its business, including the identity of Metro's retail customers for its Bogle wine and Non-Bogle Wine.

100.     Likewise, Winebow, through its relationship with Bogle and its access to Winebow's Confidential Information, was well aware of the identity of Metro's retail customers for Non-Bogle Wine and aware that Metro expected these customer relationships to continue.

101.     Nevertheless, Defendants, on information and belief, intentionally and without privilege interfered with Metro's relationships with its customers for Non-Bogle Wine. As alleged above, Defendants' actions misled Metro into providing Winebow with its Confidential Information. Winebow, on information and belief, then utilized the Confidential information to sell various brands of wine to Metro's customers, including but not limited to Dominick's,

Whole Foods, Meijer, Fresh Market, Sunset Foods, Treasure Island, Woodman's Food Market and Binny's Beverage Depot, resulting in lost sales and profits to Metro.

102.    As a direct and proximate result of Defendants' intentional interference with Metro's prospective economic relations, Metro has sustained substantial monetary damages, including its loss of sales, the lost value of its business and the loss of its goodwill.

103.    Defendants' tortious interference was marked by deception and bad faith, warranting the imposition of punitive damages.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Defendants and:

A.    Award Metro all compensatory damages resulting from Defendants' tortious interference with Metro's prospective economic relations,

B.    Award Metro statutory pre-judgment and post-judgment interest,

C.    Award Metro punitive damages because of the intentional nature of Defendants' conduct in an amount sufficient to deter further lawless conduct by Defendants and others, and

D.    Award Metro such other relief as the Court or jury deems just and proper.

## COUNT IX
## CIVIL CONSPIRACY TO COMMIT TORTIOUS ACTS
### (Metro v. Bogle and Winebow)

104.    Metro realleges paragraphs 1 through 45 and paragraphs 72 through 103 as though fully set forth herein.

105.    On information and belief, Defendants agreed to execute a plan through which they would unlawfully Metro's business and expropriate sales and profits from Metro to benefit Winebow.

106. On information and belief, in furtherance of their conspiracy, Defendants, together and singly, committed the following overt acts: (a) tortiously interfered with Metro's existing and prospective business relationships with Bogle and its Bogle retail customers, (b) tortiously interfered with Metro's existing and prospective business relationships with its retail customers for the sale of Non-Bogle wine, (c) made material misrepresentations and omissions of fact to Metro in order to obtain Metro's Confidential Information, and (d) aided and abetted Winebow's fraud.

107. As a direct and proximate result of Defendants' conspiracy and the illegal acts committed in furtherance of the conspiracy, Metro has suffered substantial monetary damages based, in part, on its loss of sales, the lost value of its business and the loss of its goodwill.

108. Because of the intentional nature of Defendants' conduct, the imposition of punitive damages is warranted.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Defendants and:

A.     Award Metro all compensatory damages resulting from Defendants' unlawful conspiracy,

B.     Award Metro the disgorgement of all benefits received by Defendants resulting from their illegal conduct,

C.     Award Metro statutory pre-judgment and post-judgment interest,

D.     Award Metro punitive damages because of the intentional nature of Defendants' conduct in an amount sufficient to deter further lawless conduct by Defendants and others, and

E.     Award Metro such other relief as the Court deems just and proper.

## COUNT X
## UNJUST ENRICHMENT
### (Metro v. Winebow)

109. Metro realleges paragraphs 1 through 45 as though fully set forth herein.

110. Through its fraud and tortious interference, Winebow has expropriated Metro's sales and profits.

111. Winebow's continued retention of the benefits from the sales and profits improperly received by it violates fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Metro respectfully requests that the Court enter judgment in its favor and against Winebow and:

A. Award Metro all compensatory damages,

B. Award Metro the disgorgement of all benefits received by Winebow resulting from its unjust conduct,

C. Award Metro statutory pre-judgment and post-judgment interest, and

D. Award Metro such other relief as the Court deems just and proper.

**METRO DEMANDS A TRIAL BY JURY FOR ALL CLAIMS AND RELIEF FOR WHICH IT IS ENTITLED TO A JURY TRIAL.**

Respectfully submitted,

METRO PREMIUM WINES, INC.

By: _____

One of Its Attorneys

Gary L. Prior
Mark H. Horwitch
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone No.: (312) 762-9450
Facsimile No.: (312) 762-9451

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement"), dated as of November 9, 2009, is by and among Winebow, Inc. ("Winebow" and the "Company") and Metro Premium Wines, Inc. (the "Recipient").

## WITNESETH

WHEREAS, the parties wish to the enter into discussions regarding a possible transaction (a "Transaction"); and

WHEREAS, as a condition to the Company disclosing confidential information to Recipient, the parties wish to enter into this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the undersigned, intending to be legally bound, does hereby agree as follows:

1. The Recipient, on behalf of itself and its affiliates, and the members, managers, shareholders, officers, directors, employees, accountants, attorneys and other representatives of Recipient and its affiliates (collectively, "Representatives"), agree not to disclose any Confidential Information of the Company, except as provided herein. For purposes of this Agreement, "Confidential Information" shall mean all such confidential or proprietary information of the Company and their affiliates whatsoever, whether communicated in writing or orally, including, but not limited to, financial information and data, personnel and compensation information, marketing data or information, pricing information, or strategies, accounting practices, trade practices, trade secrets and all other confidential business information whatsoever. Confidential Information does not include information which Recipient can demonstrate (i) was or becomes generally available to the public other than as a result of disclosure directly or indirectly by Recipient or Recipient's Representatives in violation of this Agreement; (ii) was or becomes available on a non-confidential basis from a source other than the Recipient or the Recipient's Representatives, provided that such source is not known to be bound by a confidentiality agreement; or (iii) was in the Recipient's possession prior to the date hereof without violating any confidentiality obligation to the Company.

2. All Confidential Information shall remain the property of the Company. Except as necessary for the analysis of a potential Transaction, Recipient agrees not to make copies of the Confidential Information, and to promptly return all of the Confidential Information, without retaining any copies, extracts or other reproductions thereof, and to promptly destroy all documents, memoranda, computer records and analysis, notes and other writings prepared by the Recipient or its Representatives which includes or is based on Confidential Information of the Company, immediately upon (i) any termination of discussions regarding a possible Transaction, or (ii) request by the Company, at any time. In addition, at either such time, all computer files (whether on hard drive, floppy disk, or

other media) containing any such documents, memoranda, notes or other writings shall be permanently deleted or erased.

3. Recipient agrees to use, and to cause its Representatives to use, the Confidential Information only for the purpose of evaluating a Transaction. Further, Recipient agrees to, and to cause its Representatives to, keep all the Confidential Information furnished to it confidential and not, directly or indirectly (i) disclose or distribute it to any person or entity, except as provided herein; (ii) disclose to any person or entity the fact that Recipient has had or is having discussions with the Company involving a possible Transaction; or (iii) disclose the nature of any such discussions or any of the terms, conditions or other facts with respect to a possible Transaction; except, in each case, to Recipient's Representatives who need to receive the Confidential Information for the sole purpose of evaluating a possible Transaction, and not for any other purpose whatsoever. All persons, including Representatives, who receive Confidential Information will be informed of its confidential nature and will agree to be bound by this Agreement and will agree not to use, disclose or distribute any Confidential Information to any other person or entity in violation of this Agreement. Recipient agrees to be liable for any breach of this Agreement by any of its Representatives.

4. In the event that Recipient or its Representatives is requested to provide any Confidential Information pursuant to any court or governmental order, such party shall give the Company prompt notice thereof such that the Company have the opportunity to oppose such request, and the party being asked to disclose such Confidential Information shall cooperate with the Company in protecting its Confidential Information.

5. Recipient acknowledges that the unauthorized use or disclosure of Confidential Information, or the unauthorized disclosure of the fact that the Confidential Information has been furnished to the Recipient or its Representatives, or that the parties have entered into this Agreement or are considering a possible Transaction, will cause irreparable harm to the Company's businesses and that, in addition to all other remedies at law or in equity, the Company shall be entitled to injunctive relief.

6. The parties acknowledge that there is no agreement among them regarding a possible Transaction. Nothing contained herein shall be construed as an agreement to negotiate the terms of, or enter into, any Transaction. Either party may terminate discussions regarding a possible Transaction at any time, at which time both parties shall comply with paragraph 2 above regarding the return and destruction of Confidential Information.

7. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflict of law principles. No failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof. This Agreement contains the entire agreement among the parties with respect to a potential Transaction. This Agreement may be executed in counterparts. In the event of any causes of action arising from or related to this Agreement, the prevailing party shall be entitled to recover its reasonable costs and expenses related to

such cause of action (including, without limitation, reasonable attorneys fees and expenses).

8.   Unless agreed in writing by the Company in advance, or unless a Transaction is consummated, for a period of eighteen (18) months from the date of this Agreement, Recipient shall not, directly or indirectly, acting on its own behalf or on behalf of any of its Representatives or any other person, partnership, corporation, limited liability company or other entity, solicit or induce, or attempt to solicit or induce, any employee of the Company to terminate or modify his or her relationship with the Company. Notwithstanding the foregoing, the foregoing shall not apply to any hiring as a result of public solicitations not directly aimed at employees of the Company.

9.   The Company makes no representations or warranties as to the accuracy or completeness of any Confidential Information and the Company shall not be subject to any liability resulting from the use of the Confidential Information by Recipient or Recipient's Representatives. Only those representations and warranties that are made in a definitive agreement relating to a Transaction, when, as and if executed, and subject to such qualifications, limitations and restrictions as may be specified in such definitive agreement, will have legal effect.   Recipient acknowledges that, to the extent the Confidential Information consists of financial projections, such projections may be based upon a number of assumptions and no assurances given that such assumptions are correct or that such projections will be realized. Neither the execution of this Agreement, nor the furnishing of any Confidential Information pursuant to this Agreement, shall be construed as granting to Recipient or any of Recipient's Representatives, either expressly or by implication, any license or right to use any of the Confidential Information for Recipient's or Recipient's Representatives' benefit or the benefit of any other person, or entity, or as representing any commitment by the Company to enter into any license or other agreement by implication or otherwise.

        IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date and year first written above.

                                        WINEBOW, INC.

                                        By: _____ 11-9-09
                                            Name: Kevin Groff
                                            Title:   Sr. Director Corp Development


                                        Metro Premium Wines

                                        By: _____
                                            Name: Larry Palmerson
                                            Title:   President/Principal Owner

September 30, 2010

*By Email flp@core.com), Telecopy (847-437-4616) and*
*Certified mail: return receipt requested*

Larry A. Palmerson, President
Metro Premium Wines, Inc.
1481 Elmhurst Rd., P.O. Box 1291
Elk Grove Village, IL 60009

Re:    Bogle Vineyards

Dear Mr. Palmerson:

We represent Bogle Vineyards throughout the United States.

This letter serves as a notice of termination of Metro Premium Wines as distributor of Bogle products in Illinois, effective December 31, 2010, and well as notices that Bogle has appointed a dual distributor for Illinois, effective October 1, 2010 and a notice that Bogle has placed Metro on Cash before Delivery terms, effective immediately, with respect to any shipments of wine during the next three months.

This notice is provided in accordance with the standard terms and conditions established by Bogle, (which Metro has accepted by virtue of submitting purchase orders for Bogle products: for example, see attached invoice).

This letter is also provided in good faith, as Bogle has valid business reasons to discontinue the agreement between itself and Metro. These legitimate business considerations are both sufficient reasons for termination standing alone, and good cause for the termination, as explained below, in the event that any good cause is required. Regardless, the purpose of the extension as a dual distributor until December 31, 2010 is to enable Metro to transition out of Bogle products in a reasonable and orderly fashion. If you desire an earlier termination, please contact me to discuss the alternatives, which would include repurchase of saleable inventory.

As we are sure you realize, Metro's performance with regard to Bogle brands has been deteriorating for a significant period of time. The winery has made repeated, documented, attempts to advise Metro of not only the need to improve sales and other aspects of its performance, but to provide assistance in doing so. This effort has been to no avail -- Metro's performance has been consistently deficient.

From a quantitative perspective, Metro is behind on goal year to date and is performing far below the rest of the country, which has demonstrated a marked *increase* in total sales of Bogle products year to date. Part of Metro's poor showing could be due to its continual inability (or unwillingness) to service Bogle's major chain customers, including Jewell-Osco, Trader Joe's, Target, Sam's Club and Walmart, because it is not an approved vendor for these chains. Bogle is approved in all of these accounts and has consistently explained to

Metro that it cannot properly grow its brand or service national customers unless it is able to sell to these chains in the Chicago and Illinois market. Metro's response to this concern has been to attempt to institute an arrangement with another company to sub-distribute to a single chain. As Bogle does not permit sub-distribution, which erodes the company's margins and its control, Metro's unauthorized action was not and is not a solution to this critical concern.

The problems do not end here. In particular:

- Metro has been unwilling or unable to provide Bogle with Retail Account Data. This is critical information Bogle requires in order to analyze and understand its business with its various customers.

- Bogle has documented a lengthy history of late payments by Metro, from more than 5 to more than 30 days past due (based on 60 day terms, which terms were themselves an accommodation). This practice is in direct violation of Bogle's express requirement of payment within 30 days of invoice, as specified in the Terms and Conditions attached. This situation recently has deteriorated further, with post-dated checks and requests to hold these checks until a particular date.

- Metro is increasingly out of stock on Bogle products – indeed, on several occasions Bogle had to arrange for Metro to borrow from other wholesalers. This is an issue of the utmost concern for Bogle, as the winery has received complaints directly from affected accounts.

On April 15, 2010, Bogle once again repeated the concerns detailed above and informed Metro that it would seek other options if Metro was unable to correct these issues by June 30, 2010. It has been well over 90 days since the April meeting and no progress has been made. This is not acceptable. Therefore Bogle has made the decision to terminate Metro's distributorship, effective December 31, 2010. Until that time, Bogle will continue to assist Metro in its sales of Bogle products.

Please do not hesitate to contact me, or have your attorney contact me, if you have any questions.

Sincerely yours,

John A. Hinman
Attorney for Bogle Vineyards

Attachment
Cc: Bogle Vineyards