IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| METRO PREMIUM WINES | ) ) ) ) | |
| Plaintiff, | ) | Case No. 11 C 911 |
| v. | ) ) | |
| BOGLE VINEYARDS, INC and WINEBOW, INC. | ) ) ) ) | Judge Virginia M. Kendall |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Metro Premium Wines ("Metro") distributed Bogle Vineyards, Inc.'s ("Bogle") wine in Chicago for 20 years before Bogle terminated Metro's distribution rights and handed the distribution over to Winebow, Inc. ("Winebow"). Metro alleges that Bogle and Winebow created a scheme to improperly transfer Metro's distributorship to Winebow, in part using Metro's confidential information acquired by Winebow under the guise of a potential transaction whereby Winebow would buy Metro. Bogle now moves to dismiss Metro's complaint for improper venue under Rule 12(b)(3) or to transfer under 28 U.S.C. § 1406, asserting that Bogle and Metro's dispute must be arbitrated in San Francisco under the terms of their distributor agreement. Winebow moves to dismiss under Rule 12(b)(6), asserting that Metro's claims fail by Metro's own allegations or do not meet Rule 8's pleading standard as outlined by *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). For the below reasons, the Court denies Bogle's motion (Doc. 20) and grants in part and denies in part Winebow's motion (Doc. 21).

I. BACKGROUND

   A. Metro's Allegations and Claims

The following allegations in Metro's complaint (Doc. 5) are accepted as true for the purposes of Winebow's Rule 12(b)(6) motion to dismiss. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Bogle is a California-based vineyard, and Metro is an Illinois-based wine and spirit distributor. Around 1990, Bogle and Metro entered into an oral distributorship agreement that gave Metro the exclusive right to distribute Bogle wines in the Chicagoland area. Over the years sales of Bogle's wine in Metro's territory increased substantially. By 2009, Bogle's wine accounted for 59 percent of Metro's sales.

According to Metro, Bogle was determined to replace Metro with Winebow, Bogle's distributor in New York and New Jersey. Because Winebow did not have the knowledge of the Chicagoland market that Metro had, Bogle and Winebow "hatched a scheme" to replace Metro and use Metro's confidential business information to compete against Metro. To that end, in October 2009, Winebow approached Metro and expressed an interest in buying Metro. Winebow told Metro that it needed Metro's confidential sales, pricing and financial data to perform its "due diligence" in advance of any acquisition. Metro and Winebow signed a confidentiality agreement that Winebow would only use Metro's confidential information in connection with making an offer to buy Metro. Bogle, unsolicited, told Metro that it would look favorably on the transaction. Metro alleges that Winebow had no intention of actually buying Metro, and that the proposed transaction was simply a ruse to obtain Metro's confidential information so that Winebow could successfully distribute Bogle's wine in Chicago. Bogle, according to Metro, knew that Winebow was not interested in buying Metro.

After the parties signed the confidentiality agreement on November 9, 2009, Metro sent its confidential information to Winebow. Three days later, Winebow registered to do business in Illinois and, around the same time, applied to the state liquor commission for a license to distribute alcohol in Illinois. On February 11, 2010, the commission granted that license and Winebow commenced its distribution operations out of a warehouse on Chicago's north side. Two months later, Winebow made an "absurdly" low offer to buy Metro that "was clearly intended to force a rejection from Metro, which it did." On September 30, 2010, Bogle sent Metro a notice of termination of the distributorship. That notice states that it was provided in accordance with Bogle's "standard terms and conditions" as listed on Bogle's invoices. It lists various reasons for the termination, including flagging sales growth, not being able to sell to major chains like Jewel-Osco and Trader Joe's, and problems keeping Bogle wine in stock. Metro's distributorship has since ended, "devastating" its business. Metro also alleges that Winebow actively uses Metro's confidential information to sell all types of wine to Metro's customers.

Metro brings a series claims, some against Bogle, some against Winebow, and some against both. Metro alleges Bogle breached the distributor agreement by not giving Metro reasonable notice and the implied duty of good faith and fair dealing. It also asserts a fraud claim against Bogle for aiding Winebow's fraud by inducing Metro to pursue a possible transaction with Winebow. Metro asserts Winebow breached the confidentiality agreement, tortiously interfered with Metro's relationships with Bogle and its retail customers, fraudulently induced Metro into the confidentiality agreement to steal its information. Metro also alleges unjust enrichment against Winebow for

3

expropriating Metro's profits.[1] Metro brings a conspiracy claim against Bogle and Winebow together, and alleges that they have interfered with Metro's relationships with its customers for non-Bogle wine.

B.      **Bogle's Terms and Conditions and the Arbitration Clause**

Bogle submits three declarations in support of its motion to dismiss in favor of arbitration. The first, from Bogle's Vice President Ryan Bogle ("Ryan"), states that there is no written distributorship agreement between Bogle and Metro. (Doc. 20-1, Ryan Dec. ¶ 3.) Bogle has posted "Terms and Conditions" ("Terms") on its website in various versions since January 30, 2008. (*Id.* ¶ 4.) Starting on August 25, 2010, Bogle put the same Terms on the back of its invoices to its distributors, including Metro. (*Id.*) Those Terms direct that California law governs Bogle's relationships with its distributors and include an arbitration clause with states:

> In the event of any dispute related to [Bogle], [Bogle's] Products or Distributor's rights to continue distributing [Bogle] products, Distributor agrees that the same shall be resolved by arbitration in San Francisco in accordance with the [rules] of JAMS . . . . The decision of the arbitrator shall be final and binding on the parties.

(Doc. 20-1, Ex. A, ¶ 4.) The Terms "apply to any goods purchased from [Bogle] by Distributor .... [A Distributor's] submission of a purchase order for any [Bogle] product shall constitute agreement to these [Terms], which may [sic] by modified at any time by policies found at [Bogle's website]." (*Id.* ¶ 6.) It allows the arbitrator to allocate attorney's fees and costs but forbids punitive damages. (*Id.* ¶ 4.) Bogle put the arbitration clause favoring San Francisco in the Terms to reduce its litigation burden as a "small Northern California winery." (Ryan Dec. ¶ 5.)

---

[1] Metro also brings a claim for reformation of the confidentiality agreement with Winebow based on mutual mistake, alleging that the parties' names, as they appear in the contract, should be flipped to make it clear that Metro was giving the information and Winebow receiving it.

According to Harry Brody, Bogle's Midwest Regional Manager, Bogle's Terms were available on Bogle's website by clicking on first on one tab of the website, then a second tab, and finally by clicking by a link at the end of a page. (Doc. 20-2, Brody Dec. ¶ 2.) Bogle's website also posted several items "essential to any distributor," including marketing, advertising and sales materials. (*Id.* ¶ 3.) Brody referred Metro employees, including its president, Larry Palmerson, to Bogle's website at least five times per year between 2008 and 2010, emphasizing that it was important for Bogle's distributors to be familiar with the website. (*Id.* ¶ 5.) Brody discussed Bogle's published Terms with Palmerson "numerous" times between 2008 and 2010, usually in the context of reminding Palmerson that Bogle extended more generous payment terms to Metro than other distributors. (*Id.* ¶ 7.) He sent at least one email telling Palmerson to go to the website to download a sales sheet. (*Id.* ¶ 6.)

Brian Wilkinson, Bogle's controller, states that since Feburary 2008 (right after the Terms went on the website), Metro has submitted 175 purchase orders to Bogle for over $3.5 million worth of wine. (Doc. 20-3, Wilkinson Dec. ¶¶ 4-5.) In response to those purchase orders, Bogle shipped wine to Metro and sent an invoice for payment. (*Id*. ¶¶ 4-6.) On August 26, 2010, Wilkinson sent all of Bogle's distributors, including Metro, a notice stating that Bogle's Terms had been on its website since 2008 and that they would, going forward, also appear on the back of Bogle's invoices. (*Id.* ¶ 6.) The Terms appeared on half a dozen invoices sent to Metro after August 26, 2010, and Metro submitted three purchase orders to Bogle after that date. (*Id.* ¶ 6.)

Metro, in turn, offers a declaration from Palmerson. According to Palmerson, Metro had no notice of Bogle's Terms until August 26, 2010. (Doc. 26-1, Palmerson Dec. ¶ 6.) Specifically, Bogle did not direct any Metro employee to review the Terms on Bogle's website or suggested that

5

anyone at Metro review the Terms on the website. (*Id.* ¶ 7.) The distributor agreement between Bogle and Metro did not have an arbitration provision, and Palmerson (and Metro) never discussed an arbitration provision with Bogle. (*Id.* ¶ 7.) Bogle unilaterally imposed the Terms, never giving Metro an opportunity to negotiate any arbitration term. (*Id.* ¶ 8.) Bogle's August 26, 2010 notice did not specifically mention the arbitration provision, and Metro was not aware of it until September 30, 2010. (*Id.* ¶ 9.) Without Bogle's business, Metro is not profitable. (*Id.* ¶ 10.)

## II.     MOTION TO DISMISS STANDARDS AND CHOICE OF LAW

### A.     Improper Venue, Arbitration and Choice of Law

If the parties have a valid arbitration clause, venue is not proper in this District and the Court may dismiss the case entirely or transfer it to the Northern District of California for that court to order the dispute into arbitration. *See* 28 U.S.C. § 1406(a) (directing a court to dismiss or transfer where there is improper venue); Fed. R. Civ. P. 12(b)(3); *Continental Ins. Co. V. M/V Orsula*, 354 F.3d 603, 608 (7th Cir. 2003) (affirming the lower court's decision to dismiss the case for improper venue, rather than transferring it); *Metro. Life Ins. Co. v. O'Malley*, 392 F. Supp. 2d 1042, 1045 (N.D. Ill. 2005) (dismissing complaint under Rule 12(b)(3) after finding the parties had a valid agreement to arbitrate).

Though the Federal Arbitration Act (FAA) generally favors arbitration, whether the parties have agreed to arbitrate the dispute is a state law question. *See Cont. Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 730 (7th Cir. 2005); *Tinder v. Pinkerton Security*, 305 F.3d 728, 733 (7th Cir. 2002) (same). As for which state's law should control, the parties agree—albeit for different reasons—that California law governs the question of whether the parties have a valid arbitration clause. Consequently, the Court applies California law. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*,

580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (internal citation and quotation marks omitted); *Roberts & Schaefer Co. v. Merit Contracting, Inc.*, 99 F.3d 248, 252 (7th Cir. 1996) (interpreting a forum selection clause using the law of the state that the parties agreed applied). Finally, as to Bogle's motion to dismiss for improper venue, the Court will construe all facts and draw all reasonable inferences in favor of Metro. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, at *10 (7th Cir. 2011) (noting that on a Rule 12(b)(3) motion to dismiss for improper venue based on a forum selection clause, "the judge was required to accept the plaintiffs' version of events as true" and citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007)).

### B. Failure to State a Claim

To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint must be "plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (noting "'plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not.") A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. Determining whether a complaint states a plausible claim for relief requires "the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. "Specific facts are not necessary . . . the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Swanson*, 614 F.3d at 404 (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). In

7

short, under *Iqbal*, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together . . . the court will ask itself could these things have happened, not did they happen." *Swanson*, 614 F.3d at 404.

## III. DISCUSSION

### A. The Parties Have Not Agreed to Arbitrate

According to Bogle, the Court should dismiss the case because the parties have agreed to arbitrate their dispute in San Francisco under the Terms published on Bogle's website and then added to the back of Bogle's invoices. As an initial matter, it is clear that if the arbitration clause is valid, it applies here because this dispute concerns Metro's "rights to continue distributing [Bogle] products." The Court's next job is to determine whether the parties agreed to arbitrate this dispute according to the arbitration clause in Bogle's Terms. *See Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 787 (Cal. App. Ct. 1998) (finding that the public policy favoring arbitration "cannot displace the necessity for a voluntary *agreement* to arbitrate.") (italics in original).

The parties agree that the California Uniform Commercial Code ("UCC") applies to the sale of Bogle's wine and there can be no dispute that both Metro and Bogle are merchants for UCC purposes. This case implicates a pair of UCC sections. The first, Section 2207, modifies the common law "mirror image" rule that required an offer and its acceptance to have the exact same terms to be effective. *See Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 514 (Cal. App. Ct. 1996). Section 2207 states that an acceptance "operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." Cal. U. Com. Code. § 2207(1). If the acceptance has additional terms and the parties are merchants, those terms become

8

part of the deal unless, among other reasons, the new terms "materially alter" the contract. *Id.* § 2207(2)(b). Section 2207 addresses "the exchange of printed purchase order and acceptance . . . forms." *Id.* § 2207 cmt. 1. "Because the forms are oriented to the thinking of the respective drafting parties," the Commentary continues, "the terms contained in them often do not correspond. Often the seller's form contains terms different from or additional to those set forth in the buyer's form. Nevertheless, the parties proceed with the transaction." *Id.* In those situations, the contract consists of the terms on which the two forms agree together with any default rules supplied by the UCC, but not the conflicting terms. *See* Cal. U. Com. Code. § 2207(3). The second UCC provision at issue, Section 1303, allows the Court to interpret the parties' contract based on a "course of performance," where the parties have repeatedly performed and one party "accepts the performance or acquiesces in it without objection" when that party has "knowledge of the nature of the performance and opportunity for objection to it." *Id.* § 1303(a), (b).

Resolving all factual disputes in favor of Metro, as the Court must, the parties had an oral distribution agreement for Metro to distribute wine in the Chicagoland area beginning in 1990. That oral agreement did not have an arbitration provision. To order wine from Bogle, Metro submitted a purchase order with terms of the sale. Bogle would then respond with an invoice with different terms, and Metro would pay for that wine sometime later. The parties operated that way for about 20 years. In early 2008, Bogle put the Terms on the website, and on August 25, 2010, put the Terms on the back of its invoices. Metro was not aware of the Terms generally until August 26, 2010, when it received Bogle's notice, and not aware of the arbitration clause specifically until September 30, 2010. After August 26, 2010, Metro submitted three purchase orders to Bogle (between September 10 and September 14, 2010), and Bogle responded with invoices with the Terms on the back.

9

UCC Section 2207 fits Metro and Bogle's practice snugly. There is no doubt the parties performed the contract: Bogle shipped wine to Metro, and Metro paid Bogle for it. This is the classic "battle of the forms:" the Court has no reason to accept Bogle's invoices, with an arbitration clause, over Metro's purchase orders, which have no such clause. *See* Cal. U. Com. Code § 2207; *Transwestern Pipeline*, 46 Cal. App. 4th at 516 (applying § 2207 to inconsistent purchase orders and invoices and finding the extra terms in the invoices did not become part of the deal). Here, under § 2207, the additional terms in Bogle's invoices, including the arbitration clause, were proposals—unaccepted by Metro—to be added to the parties' contract. Because Bogle and Metro are merchants, those extra terms from Bogle would become part of the contract unless they materially alter it. *See* Cal. U. Com. Code § 2207(2)(b). California law is clear that an arbitration clause is a material alteration to a contract under § 2207 because it deprives a party from procedural protection to which it would otherwise be entitled. *See Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 995 (Cal. App. Ct. 1972); *Regency Wines, Inc. v. Champagne Montaudon*, No. B140757, 2002 WL 31788972, at *7 (Cal. App. Ct. Dec. 13, 2002) (noting "[u]nder California law, the addition of an arbitration provision constitute[s] a material alteration as a matter of law."); *see also Coastal Ind., Inc. v. Automatic Steam Prods. Corp.*, 654 F.2d 375, 379 (5th Cir. 1981) (finding an arbitration clause materially alters a contract because a litigant from loses its judicial forum). Consequently, the arbitration clause remained only a proposal and did not become part of the parties' contract.

Bogle claims that the parties past practice creates a "course of dealing" under § 1303. In *Transwestern Pipeline*, the court applied § 2207, not course of dealing, to resolve a dispute factually similar to this one. For over a decade, the pipeline company in that case bought lubricant from a

manufacturer by sending purchase orders with no provision limiting the manufacturer's liability. *See* 46 Cal. App. 4th at 513. The manufacturer responded with invoices limiting its liability to the purchase price. *Id.* Those invoices, like Bogle's, stated that if the pipeline company accepted the lubricant, it accepted the terms on the invoice. *Id.* When the manufacturer sought to enforce the liability limitation, the court found "[c]ommon sense tells us the mere exchange of form containing inconsistent terms, for however long a period, cannot establish a common understanding between the parties as to which set of conflicting terms is part of their contract." *Id.* The court then pointed out why course of dealing is unhelpful to resolve disputes where the parties exchange inconsistent forms but perform the contract. "Each party," the court reasoned, "is equally entitled to claim its terms and conditions constituted the parties' 'course of dealing.'" *Id.*

Moreover, course of dealing under § 1303 requires that the other party *knowingly* acquiesce. Accepting Metro's version of the events as true, the earliest Metro should have known of the Terms was August 26, 2010, when it received Bogle's notice. Metro submitted just three purchase orders in a five-day span in September that are "eligible" to be part of any course of dealing. Though there are no hard and fast rules that set out when a series of transactions becomes "a course of dealing," three transactions in five days is plainly insufficient to establish a common understanding between the parties and Metro's acquiescence in this context.

### B. Transfer Under § 1406 Is Not Warranted

In the alternative, Bogle wants the Court to transfer this case to the Northern District of California under 28 U.S.C. § 1406. Bogle makes no independent argument why the case should be transferred beyond asserting the arbitration clause. Indeed, the request for transfer appears to be another way to effectuate the arbitration clause if the Court does not dismiss the case under Rule

11

12(b)(3). In any event, transfer is inappropriate here because venue is proper in this District and there is no reason to transfer the case "in the interests of justice." *See* 28 U.S.C. § 1406; 28 U.S.C. § 1391 (venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

        C.        **Metro Has Stated Claims Against Winebow**

                1.        **Contract and Quasi-Contract Claims**

Winebow asserts that Metro has not plead enough under *Twombly* and *Iqbal* to state a claim for breach of the parties' confidentiality agreement. Specifically, Winebow claims that Metro has not provided Winebow the "grounds for its suspicion" that Winebow is using Metro's confidential information in an impermissible way. This argument is nearly frivolous. Metro alleges that Winebow approached Metro for a possible transaction, and registered to do business and sell alcohol in Illinois just three days after receiving Metro's confidential information. According to Metro, less than a year after receiving the confidential information, Metro had been terminated as Bogle's distributor and Winebow—which had not previously operated in Chicago—was up and running and selling wine to Metro's former customers. This story "holds together" for the purposes of stating a claim that Winebow breached the agreement for the purposes of Rule 8. *See Swanson*, 614 F.3d at 404. Counts III (reformation of the confidentiality agreement) and IV (breach of the confidentiality agreement) stand.

Metro's unjust enrichment claim stands as well. "When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-689 (7th Cir. 2004). Though Metro and Winebow have a contract in place (the confidentiality agreement), Metro's unjust

enrichment claim is not based on that contract. Rather, Metro's claim seeks to recover the "sales and profits" that Winebow is receiving as a result of its alleged fraud and tortious interference. Those sales and profits are not necessarily the same damages available to Metro under its breach of contract theory.

### 2. Tort Claims

#### a. Tortious Interference

Though they are organized differently in the complaint, Metro brings two claims for tortious interference with prospective economic relations against Winebow: one for interfering with Metro's relationship with Bogle, and the other for interfering with Metro's relationship with its retail customers for both Bogle and non-Bogle wine. To allege tortious interference, Metro must allege that (1) it had a reasonable expectancy of entering (or continuing) into a valid business relationship; (2) Winebow had knowledge of that expectancy; (3) Winebow intentionally and unjustifiably interfered with the relationship and induced its termination; and (4) Metro was damaged as a result of the interference. *See Voyles v. Sandia Mort. Corp.*, 751 N.E.2d 1126, 1133-34 (Ill. 2001). Though tortious interference claims may be brought for interference with at-will relationships (*see Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999)), Metro must plead that both it and Bogle wanted to continue that relationship. *See Ali v. Shaw*, 481 F.3d 942, 944-45 (7th Cir. 2007) (applying Illinois law and noting "parties to the at-will contract must be willing and desirous of continuing it in order for the action to lie when the contract is at-will") (internal citation and quotation omitted).

Metro alleges in its complaint that Bogle's sales manager "was resolved to replace Metro as Bogle's distributor." Winebow cannot interfere with a relationship that Metro concedes Bogle

wanted to end. Distributors must be allowed to compete for new business when a supplier is unhappy with its current partner. Allowing jilted businesses to bring an interference claim in such circumstances would chill competition. *See Speakers of Sport*, 178 F.3d at 865 ("competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system."). To the extent that Winebow won that business from Metro's unsatisfied partner through improper means (namely, the transaction/confidentiality agreement ruse), Metro has its fraud and breach of contract claims to seek damages from Winebow. For the same reasons, Metro's claim against Winebow for interfering with its relationship with Metro's customers with respect to Bogle wine also fails. Given Metro's allegations, it had no reasonable expectation that it would remain Bogle's distributor and be able to sell Bogle wine to those customers. However, Metro has stated a claim against Winebow for tortious interference with Metro's relationships with its retail customers for non-Bogle wine. Metro alleges that Winebow used the confidential information it received by tricking Metro to sell non-Bogle wine to specific retail customers, as well the other elements of tortious interference. That is enough for now. In sum, Count V is dismissed and Count VIII stands.

### b. Fraud and Civil Conspiracy

Implicitly conceding that the claim has been plead with particularity, Winebow asserts that Metro's fraud claim fails because it has not alleged any statement of a pre-existing fact, only that Winebow was thinking about buying Metro. Winebow calls its statements "opinions" or statements about "future contingent events." But Metro is not suing Winebow because the transaction did not go through. Metro asserts that the false statement was Winebow's statement that Winebow had an interest in buying Metro - a pre-existing fact. According to Metro, Winebow *never* intended to buy

Metro - the transaction was just a ruse to get Metro's confidential information. Had Winebow told the truth and said it was only after Metro's information, Metro would not have signed the confidentiality agreement and handed over the information. That is a straightforward fraudulent inducement claim. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998) (listing the elements of fraudulent inducement in Illinois as: (1) a false representation of a material fact; (2) made with knowledge or belief that the representation is false; (3) made with the purpose of inducing the plaintiff to act; and (4) with the plaintiff's reasonable belief in and reliance on the statement to his detriment.)

However, Metro's other fraud theory, promissory fraud, does not state a claim. Metro claims that Winebow entered the confidentiality agreement with no intent to keep its promise to not misuse Metro's confidential information in the future. Promissory fraud applies where "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to its detriment." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992). Illinois is skeptical of promissory fraud claims. *See Petrakopoulou v. DHR Int'l, Inc.*, 660 F. Supp. 2d 935, 938 (N.D. Ill. 2009) (citing *Gen. Elec. Credit Auto Lease, Inc. v. Jankuski*, 532 N.E.2d 361, 363-64 (Ill. App. Ct. 1988)) "Promissory fraud is actionable only if it either is particularly egregious or . . . it is embedded in a larger pattern of deceptions or enticements." *Desnick v. Am. Broadcasting Cos.*, 44 F.3d 1345, 1354 (7th Cir. 1995) (surveying the Illinois caselaw and identifying an "understandable ambivalence" about the scope of the scheme exception given the "risk of turning every breach of contract suit into a fraud suit."). Though applying the scheme exception is difficult (*see Petrakopoulou*, 660 F. Supp. 2d at 938), this case is better characterized as a fraudulent inducement case, not a promissory fraud case because Metro's

15

allegations center on a single promise in a single contract. *See Speakers of Sport*, 178 F.3d at 865-66 (finding that requiring a pattern tempers the "threat to the competitive process" and "reduces the likelihood of a spurious suit, for a series of unfulfilled promises is better . . . evidence of fraud than a single unfulfilled promise."). In short, Metro's promissory fraud theory is really just a dressed-up breach of contract claim.

Because Metro's fraud claim survives and Metro has alleged that Bogle and Metro agreed to accomplish a lawful purpose (changing distributors) via unlawful means (fraudulent inducement), as well as the other elements of civil conspiracy, the Court will not dismiss that claim. *See Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir. 2004) (defining a civil conspiracy under Illinois law as "(1) an agreement; (2) by two or more persons; (3) to perform an overt act or acts; (4) in furtherance of the agreement/conspiracy; (5) to accomplish an unlawful purpose or a lawful purpose by unlawful means; (6) that causes injury to another."); *Clarage v. Kuzma*, 795 N.E.2d 348, 358 (Ill. App. Ct. 2003) (reinstating a civil conspiracy claim after reversing the dismissal of the underlying tort claims).

### 3. Punitive Damages

Finally, Winebow asks the Court to strike Metro's prayer for punitive damages. Metro has alleged a plan by Winebow to use cover of a potential transaction to take a short-cut to successfully distributing wine in Chicago at Metro's expense. Given that mergers, buy-outs and other business transactions are necessary for a well-lubricated economic system and cannot be accomplished without confidentiality agreements, willful abuse of those agreements could be considered by the jury to be outrageous and willful conduct. The Court will not strike Metro's punitive damages prayer as a matter of law at this early stage of the case. *See, e.g., Republic Tobacco Co. v. N. Atl. Trading Co., Inc.* 381 F.3d 717, 735 (7th Cir. 2004) (noting that punitive damages are available for willful

16

conduct in Illinois and upholding a punitive damage award where "[e]vidence was presented that in order to gain a business advantage over its competitor, [the defedendant] made statements without regard to their truth."); *Cohen v. Lewis*, No. 03 C 5454, 2004 WL 2481015, at *7 (N.D. Ill. Nov. 3, 2004) (refusing to strike a punitive damages prayer at the motion to dismiss stage where the plaintiff had alleged that the defendants intentionally sought to destroy the plaintiff's business).

## IV. CONCLUSION

For the above reasons, Bogle's motion to dismiss for improper venue or transfer (Doc. 20) is denied. Winebow's motion to dismiss for failure to state a claim (Doc. 21) is granted in part and denied in part. Count V is dismissed with prejudice. Count VI is dismissed in part with prejudice to the extent it alleges promissory fraud. The remaining counts against Winebow stand.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 14, 2011