IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

METRO PREMIUM WINES                )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )
                                   )    Case No. 11 C 911
BOGLE VINEYARDS, INC and           )
WINEBOW, INC.                      )
                                   )    Judge Virginia M. Kendall
                    Defendant.     )
                                   )

### **MEMORANDUM OPINION AND ORDER**

Plaintiff Metro Premium Wines, Inc. ("Metro") sued Bogle Vineyards, Inc. ("Bogle") and Winebow, Inc. ("Winebow"), alleging that Bogle and Winebow hatched an improper scheme to take away Metro's distributorship of Bogle's wine in the Chicago area in favor of Winebow. As alleged by Metro, Winebow, with Bogle's assistance, told Metro that Winebow wanted to buy Metro, and Metro turned over its confidential information, only to have Winebow turn around and use that information to jump start its distribution of Bogle's wine in Chicago. The Court previously denied Bogle's motion to dismiss for improper venue, and dismissed Metro's claim that Winebow tortiously interfered with Metro's relationship with Bogle. The Court gave Metro the opportunity to re-plead its tortious interference claim. Now that Metro has filed an amended complaint, Winebow seeks to dismiss the tortious interference claim again, and Bogle moves to dismiss Metro's fraud, conspiracy and tortious interference claims, having moved only under Rule 12(b)(3) before. For the following reasons, the Court grants Winebow's motion and denies Bogle's motion.

I.    FACTS[1]

In an effort to cure the state a claim for tortious interference, Metro added a number of new allegations and exhibits to its amended complaint.  The Court will focus on Metro's new allegations in this opinion.  About 20 years ago, Bogle, a California vineyard, and Metro, an Illinois wine distributor, entered into an oral distributorship agreement that gave Metro the exclusive right to distribute Bogle wines in the Chicagoland area.  Over the years, Bogle's sales in Chicago grew, Metro invested in its distribution efforts for Bogle, and sales of Bogle's wine became majority of Metro's business.  According to Metro, Bogle and Metro both took steps in 2009 to 2010 to affirm their relationship, including efforts by Bogle to help Metro distribute Bogle's wine to retailers Target, Sam's Club, and Meijer.

Metro alleges, "on information and belief," that sometime in 2009, Winebow, Bogle's distributor in New York and New Jersey, approached Bogle's national sales manager Sam Bon and "improperly incentivized him" to convince Metro to hand its confidential business information over to Winebow in connection with a proposed purchase of Metro by Winebow.  Bon would then convince Metro to sell to Winebow at a firesale price by threatening to end the Metro-Bogle distribution relationship.  According to Metro, Bon's plan to swap out Metro in favor of Winebow was not in the best interests of the Bogle or Bogle's owners.

Specifically, in October 2009, Kevin Groff, a Winebow employee,  approached Metro and expressed Winebow's interest in buying Metro.  Winebow told Metro that it needed Metro's confidential sales, pricing and financial data to perform as due diligence in advance of any

---

[1] The allegations in Metro's amended complaint (Doc. 44) are accepted as true for the purposes of the Rule 12(b)(6) motions to dismiss.  *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

acquisition. Metro and Winebow signed a confidentiality agreement stating that Winebow would only use Metro's confidential information in connection with making an offer to buy Metro. Bon then made several unsolicited calls to Larry Palmerson, Metro's president, later that month to encourage him to sell Metro to Winebow. Metro alleges that Winebow had no intention of actually buying Metro, and that the proposed transaction was simply a ruse to obtain Metro's confidential information so that Winebow could successfully distribute Bogle's wine in Chicago. Bon, according to Metro, knew that Winebow was, in fact, not interested in buying Metro. In December 2009, Bon again called Palmerson without prompting, and pressured him to sell Metro to Winebow. The next day, Palmerson wrote a letter to Bon in response to the conversation, noting that Bon "seemed to be selling [him] on Winebow" and that Bon threatened to end the distributorship "regardless" of whether Palmerson sold Metro to Winebow. (*See* Am. Compl., Doc. 52, Ex. F.) Palmerson also wrote that he hoped Bon had not told Winebow that Bon would take away the distributorship in any event because it would compromise his bargaining position with Winebow. (*Id.*)

After the parties signed the confidentiality agreement on November 9, 2009, Metro sent its confidential information—including sales, pricing and financial data—to Winebow. Three days later, Winebow registered to do business in Illinois and, around the same time, applied to the state liquor commission for a license to distribute alcohol in Illinois, even though, if it bought Metro, it would not need a separate license. On February 11, 2010, the commission granted that license and Winebow commenced its distribution operations out of a warehouse on Chicago's north side. On March 26, 2010, Groff and Palmerson met and Winebow made an "absurdly" low offer of $500,000 to buy Metro. Palmerson followed up with a letter to Groff, copying Jody Bogle, one of Bogle's owners, stating that Winebow's offer was inadequate because a recent an appraisal found Metro was

worth about $2 million. (*See id*., Ex. G.) Ten days later, Bon sent Palmerson a letter stating that for two years, Bogle had raised issues about Metro's sales performance, inability to service major retailers like Osco and Target, and unwillingness to share retail information with Bogle. (*See id*., Ex. H.) Bon also noted that Bogle's sales growth in Illinois was just half of the growth rate in the rest of the country and that Metro was locked out of certain retailers. (*Id*.) The letter requested action by June 30, 2010, or else Bogle would find another distributor. (*Id*.)

Palmerson responded a week later with a letter to Bogle's owners, stating that he was "hurt" by Bon's letter given Metro and Bogle's long relationship, that Bon's expectations were unrealistic, and that Bon had rejected a solution proposed by Palmerson to distribute wine to a particular grocery store chain. (*See id*., Ex. I.) He closed by stating that Bon was pressuring him to sell Metro to Winebow. (*Id*.) On May 7, 2010, Winebow told Metro that Winebow would not raise its offer, but that it would keep the discussions confidential. A few days later, Palmerson wrote to Bon again, complaining that Bon had undermined his negotiations with Winebow by telling Winebow that Bon intended to take away Metro's distribution rights, and that Metro's salespeople had heard from a rumor from Metro's retailers that Metro was losing Bogle's business. (*See id*., Ex. I.) A few months later, Palmerson reported to Bogle's owners that Metro's sales were up and that Metro had made efforts to place Bogle wine at Sam's Club. In the same letter, Palmerson suggested that he speak with two other distributors that distributed to all the major chains, and reiterated that he would not sell Metro "for a low ball figure." (*See id*., Ex. L.) In August 2010, Palmerson sent a letter to Winebow's CEO, listing various scenarios for Winebow to purchase Metro and requested the return of Metro's confidential information, but Winebow never raised its offer or returned the information.

Later that summer, Bogle changed its credit terms for Metro and would not ship wine to

Metro until Metro's checks cleared, and the parties had disputes about whether Metro being out of stock was Metro's or Bogle's fault. Metro attached to its complaint one communication from September 23, 2010 from a Bogle employee complaining to Metro that it was currently out of stock on popular types of wine and these shortages "have been a familar topic over the past year, but with little response from Metro." (*Id.* at Ex. Q.) Ultimately, on September 30, 2010, Bogle sent Metro a notice that it was terminating the distributorship. The notice lists various reasons for the termination, including flagging sales growth, not being able to sell to major chains like Jewel-Osco and Trader Joe's, and problems keeping Bogle wine in stock. Metro's distributorship has since ended, devastating its business. Winebow has taken over the distribution of Bogle's wine in Chicago, and Metro alleges that Winebow actively uses Metro's confidential information to sell all types of wine, including Bogle wine, to Metro's customers.

Finally, Metro alleges that although Bon was acting in the scope of his authority as national sales manager at Bogle when he pressured Metro to sell to Bogle, his tactics were not in the best interests of Bogle. According to Metro, because Bogle could end the oral distribution arrangement at any time, Bogle could have simply exercised its right to terminate the agreement and handed the distribution over to Metro. In other words, Bogle would have been no better off if Palmerson sold Metro to Bogle, and "on information and belief," is worse off, because Winebow is selling less than Metro. These facts, Metro asserts, demonstrate that Bon was improperly incentivized by Winebow.

Metro brings the following claims in its new complaint: breach of oral distributor agreement and breach of the implied duty of good faith against Bogle (Counts I and II); reformation and breach of the confidentiality agreement against Winebow (Counts III and IV); tortious interference with prospective economic relations (as to the relationship with Bogle) against Winebow (Count V); fraud

and aiding and abetting fraud against Winebow and Bogle, respectively (Counts VI and VII); tortious interference (as to Metro's relationships with third party customers) against Winebow and Bogle (Count VIII); and conspiracy against both defendants (Count IX).

## II.    STANDARD

To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint must be "plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (noting "'plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not.") A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. Determining whether a complaint states a plausible claim for relief requires "the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. "Specific facts are not necessary . . . the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Swanson*, 614 F.3d at 404 (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). In short, under *Iqbal*, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together . . . the court will ask itself could these things have happened, not did they happen." *Swanson*, 614 F.3d at 404.

## III.   DISCUSSION

### A.   Previous Opinions

In its June 14, 2011 opinion, the Court denied Bogle's motion to dismiss in favor of arbitration in California[2], and dismissed Metro's tortious interference claim against Winebow with respect to Bogle wine with prejudice. (*See* Doc. 44.)  In dismissing the tortious interference claim, the Court emphasized that in deference to competition in instances of an at-will relationship, a tortious interference claim only lies where both parties want the relationship to continue, and Metro's allegations conceded that Bon wanted to end the relationship.  The Court found that all of Metro's other claims against Winebow could proceed.[3]

Metro moved to reconsider, asserting that it had pleaded "on information and belief" that Bon had an improper arrangement with Winebow and that Bogle chose to terminate the relationship with Metro because of Winebow's interference.  In that motion, Metro tried to draw a distinction between what Bon allegedly wanted to do (terminate Metro because he was improperly incentivized) and what Bogle wanted to do (continue the relationship with Metro).  In its July 18, 2011 order denying the motion to reconsider (Doc. 51), the Court noted two independent Rule 8 problems with Metro's assertion: (1) corporations act through their employees, and Metro did not plead any facts that suggested what Bon wanted to do was at odds with what Bogle wanted to do; (2) Metro's allegations regarding a "secret and improper relationship" were conclusory and insufficient under *Iqbal*.  Though the Court denied the motion to reconsider, out of an "abundance of caution" the Court gave Metro

---

[2]Bogle did not move on Rule 12(b)(6) grounds.

[3]The Court also dismissed Metro's promissory fraud theory.  Metro confirmed in its briefing that it did not intend to revive that theory in its amended complaint.  (*See* Doc. 63 at 2.)

the opportunity to re-plead its tortious interference claim.

### B.    Winebow's Motion

Winebow asserts that Metro has not cured either of the pleading deficiencies identified by the Court in its July 18 order, and consequently, Metro's tortious interference claim as to the Bogle relationship should be dismissed again.  Again, the issue is whether Metro has plead enough facts creating a reasonable inference that Bogle wanted to continue the relationship with Metro.  Because the law favors competition and the flexibilty of at-will contracts, there is no claim for tortious interference with prospective economic relations if one party to the at-will relationship wants out of the relationship.  *See Ali v. Shaw*, 481 F.3d 942, 944-45 (7th Cir. 2007) (applying Illinois law and noting "parties to the at-will contract must be willing and desirous of continuing it in order for the action to lie when the contract is at-will"); *Iqbal*, 129 S.Ct. at 1949 (requiring a "reasonable inference").  As the Court explained in its order denying Metro's motion to reconsider, because corporations are legal creations that act through their employees, Metro has to plead facts that show Bogle, as a company, wanted to keep the at-will relationship with Metro even though Bon, a senior executive, did not.

As Metro explicitly alleges, Bon wanted to end the Bogle-Metro relationship, and "all of Bon's decisions [with respect to Metro] were withing the scope his duties and his authority as Bogle's national sales director." (Am. Compl. ¶ 104.)  Metro also attaches Bogle's letter giving Metro notice of the termination; that letter is from the attorneys representing Bogle, the company. The only reasonable inference from the allegations that Bon wanted the change and that he was acting in the scope and authority of his duties at Bogle is that Bon had the power to replace Metro with Winebow and Bon's wish was Bogle's wish.  Metro does not plead anything to suggest a

8

reasonable inference that Bon needed further authority from Bogle's owners to replace Metro, or that Bon's owners wanted to keep Metro as Bogle's distributor and Bon went against their wishes. Metro's complaint attaches a number of communications where Bogle stated that it was unhappy with Metro. The termination notice sent by representatives of Bogle the company raises an reasonable inference that Bon is not a rogue employee but rather that Bogle's owners signed off on the change from Metro to Winebow.

Metro points to its allegations that in February 2010, Metro worked with a Bogle employee to place Bogle wine in new retailers in Chicago and that in one instance, the employee wrote to one of the retailers "I feel strongly that Metro is willing and able to get the job done. They have been successful with servicing stores like yours." Metro also points out that it had a long relationship with Bogle, and that Palmerson maintained a close personal relationship with Bogle's owners, citing the letters Palmerson sent to Bogle's owners (but nothing the owners sent back). First, it is a bridge too far to suggest that that Bogle's owners were at odds with Bon's decision because Palmerson stayed in contact with Bogle's owners and that Metro and Bogle had a long relationship. If this was a case where Metro was unsure whether its distribution rights were still effective, then the length of the relationship could create a reasonable inference that Bogle wanted to continue it. But Metro makes very clear that the relationship has ended,[4] so the length of the relationship before termination does not support the inference Metro seeks. As for the emails from the other Bogle employee, that same employee complained to Palmerson nine months later in September 2010 about the problems Metro was having keeping Bogle wine properly stocked. In short, the Court cannot consider the allegations

---

[4] For example, in the second paragraph of the amended complaint, Metro alleged that Bon "caused Bogle to terminate Metro's distribution agreement."

Metro highlights in a vacuum, and cannot ignore Metro's other allegations and exhibits that directly suggest that Bogle, as a company, through Bon, its duly authorized employee, wanted to end the Metro-Bogle relationship. Even crediting Metro's assertion that Bon's pressure on Metro to sell was the result of an improper incentive from Metro to Bon (the other deficiency previously identified by the Court), Metro has not plead any facts creating a reasonable inference that Bogle did not want to end the relationship. Metro cannot state a claim for tortious interference against Winebow as to the Metro-Bogle relationship and Count IV is dismissed with prejudice.

### C.    Bogle's Motion

Bogle asserts that Metro has not stated a claim against it for aiding and abetting Winebow's fraud (Count VII), for tortious interference with Metro's relationships with customers for non-Bogle wine (Count VIII), and conspiracy (Count IX).[5]  As an initial matter, citing Rule 12(g)(2), Metro asserts that Bogle's motion, brought under Rule 12(b)(6) is late because it should have been raised with its Rule 12(b)(3) motion challenging venue.  The purpose of Rule 12(g)(2) is to prevent parties from asserting their Rule 12 defenses in a piecemeal fashion and to prevent delay at the pleading stage.  *See, e.g, Donnelli v. Peters Sec. Co.*, No. 02 C 691, 2002 WL 2003217, at *3 (N.D. Ill. Aug. 29, 2002).   Though technically Bogle should have answered the claims and then filed a Rule 12(c) motion for judgment on the pleadings, here the Court thought it was more expedient to give Bogle an opportunity to attack Metro's pleading once the Court denied its venue motion, rather than having Bogle answer, and leave the pleadings unsettled during the briefing of the Rule 12(c) motion.  (*See* Doc. 51, directing both parties to answer or move to dismiss by August 10, 2011.)  As a practical matter, the standard on a Rule 12(c) and Rule 12(b)(6) is the same (*see Buchanan-Moore v. Cty. of*

---

[5]Bogle answered Metro's breach of contract claims.

*Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)), and in this case, there is no reason not to entertain Bogle's motion attacking Metro's pleading now.

Turning to the merits of Bogle's motion, Bogle first challenges, under Rule 9(b), Metro's claim that Bogle aided and abetted Winebow's fraud because Bogle encouraged Metro to consider a sale to Winebow with the knowledge that Winebow only wanted Metro's confidential information and had no intention of buying Metro. To meet Rule 9(b)'s requirement, Metro must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Metro's claim that Bogle "aiding and abetted" Winebow's fraud is really just a regular fraud claim against Bogle. *See Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623-24 (7th Cir. 2000) (noting that Illinois follows the majority view that "aiding and abetting" is not a separate tort because "it is apparent that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud.")

Specifically, Metro alleges that Bogle knowingly assisted in Winebow's fraudulent scheme when: (1) Bon called Palmerston and encouraged or pressured him to explore the transaction with Winebow (and, by extension, to turn over Metro's confidential information); and (2) it actively concealing Winebow's true intent. Further, Metro alleges Winebow was already a Bogle supplier and was taking steps to set up its Illinois operations well before Bogle ended Metro's distributorship. Of course, Metro's allegations regarding Bogle's knowledge of the scheme are circumstantial, but before discovery, it is unrealistic for Metro to be able to plead the exact circumstances of how Bogle found out about Winebow's scheme. Metro has certainly alleged a motive for Bogle for participating

11

in the scheme; through the confidentiality ruse, Bogle got the best of both worlds: a new distributor with the old distributor's market knowledge. Indeed, had Bogle just fired Metro and brought on Winebow, Winebow would have been starting from scratch. Metro has sketched out in sufficient detail, for now, that Bogle participated in a fraudulent scheme.

As Bogle points out, Metro's tortious interference claim concerning non-Bogle wine and civil conspiracy claims sound in fraud, and also must be plead with particularity under Rule 9(b). *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (requiring tortious interference and civil conspiracy claims sounding in fraud to be plead with particularity). Metro alleges that Winebow (with Bogle's help) took Metro's confidential information and has used it to sell non-Bogle wine retailers—all identified by name—to Winebow's benefit (and, by extension, Bogle's benefit, because a strong distributor is in Bogle's best interest). Contrary to Bogle's suggestion, Metro has plead more interference than simply Bogle's breach of the distributor contract. Metro has plead that Winebow (with Bogle's help) took Metro's confidential information and leveraged it to hurt Metro's relationships with its retailers. As for Bogle's claim of competitor's privilege, it is true that Bogle was free to replace Metro with Winebow. The competitor's privilege does not, however, allow Bogle and Winebow to scheme to get Metro's proprietary information to improve their competitive positions. In other words, selling to Metro's customers is not problematic, but beating Metro with its own confidential information, wrongfully obtained, is. For the same reasons, Metro has plead its civil conspiracy claim with the particularity required by Rule 9(b). Metro's conspiracy claim is not a dressed up breach of contract dispute: it is based on the scheme to improperly take and use its confidential information.

12

IV.     **CONCLUSION**

For the foregoing reasons, Winebow's motion to dismiss (Doc. 56) is granted. Bogle's motion (Doc. 57) is denied. Count IV is dismissed with prejudice, but Metro's remaining claims stand.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:   November 8, 2011

13